## John D. Casey, Administrator, Appellee, v. William Grace Company, Appellant.

### Gen. No. 16,132.

1. PLEADING—*what general issue does not deny.* Supervision and control is not denied by the plea of the general issue. A special plea is required for that purpose.

2. ORDINANCE—*providing for protection of employes construed.* *Held,* that the ordinance in question in this case, which provided for the construction of a temporary floor when certain buildings were being remodeled, was applicable to the evidence in this case and was properly admitted.

3. NEGLIGENCE—*when violation of ordinance constitutes.* A violation of a protective ordinance is *prima facie* evidence of negligence if such violation contributed to the injury.

4. MASTER AND SERVANT—*liability for injury occasioned by fall of scaffold.* While there is some difference of opinion in the reported cases as to whether or not a master is liable for a servant's injuries occasioned by the fall of a scaffold because of some latent defect, where the master directs the servant to make use of such scaffold and which scaffold the servant had no part in constructing and which had been abandoned by those who erected it, still the

current of authority seems to be that the master having adopted the scaffold as his own is consequently liable under the rule that it is the duty of the master to furnish the servant with a reasonably safe place in which to work.

Action in case. Appeal from the Superior Court of Cook county; the Hon. ARTHUR H. CHETLAIN, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1909. Affirmed. Opinion filed March 14, 1912. Rehearing denied March 28, 1912. *Certiorari* denied by Supreme Court (making opinion final).

F. J. CANTY, P. L. McARDLE and R. J. FOLONIE, for appellant.

CHARLES M. FOELL and EARL J. WALKER, for appellee; MORSE IVES, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

This is an appeal from a judgment of the Superior Court of Cook county for ten thousand dollars in an action for personal injuries, resulting in the death of William Frost, brought by the administrator of the estate of said Frost against William Grace Company. The accident occurred on February 24, 1905, and the judgment was rendered on April 17, 1909.

On the trial before a jury the defendant introduced no evidence. From the evidence of the plaintiff it appears that the deceased was a structural iron worker of about fourteen years' experience and a servant of the defendant corporation, which, by certain of its employes, was engaged in making additions to the building, known as "The Fair," located on the northwest corner of State and Adams streets, in the city of Chicago; that deceased was foreman of one of the "raising" or derrick gangs, engaged at the time of the accident in raising the iron, that is, when another gang known as the "bull" gang assembled the iron, the raising gang, with the aid of a derrick, put the columns, beams and girders into place, and this gang was in turn followed by the "riveting" gang, which riveted

the irons and removed the temporary bolts inserted by the raising gang; that the building originally consisted of nine stories, and the new construction work was the erection of two additional stories—the tenth and eleventh—between the old ninth floor and the old roof; that, to accomplish this, the roof and the old columns above the ninth floor, which supported the roof, were lifted up together by means of cribbings and jacks, and that when the roof with the old columns hanging therefrom was lifted sufficiently high, the new columns above the ninth floor were inserted, and afterwards the beams and girders of the tenth floor were placed and fastened in position, and that when this work was completed the old roof was similarly lifted and the columns above the new tenth floor inserted; that this work of lifting the roof was performed by another gang, known as "house movers," or "Freistadt's men;" that the building was made up of a large number of so called "panels"—that is, the spaces between four columns, which panels were about twenty feet square, and the distance between the floors from twelve to fifteen feet; that at the time of the accident the laying of all of the beams and girders of the tenth floor had been completed, and the several "raising" gangs were engaged in different panels of the building in placing iron in position above the tenth floor, most of the columns above the tenth floor were in, and, as one witness stated, the girders of three panels on the eleventh floor had been laid.

In order the better to understand the circumstances surrounding the accident, it is proper to describe more fully the particular construction of the building, and the methods employed in erecting the two additional stories. The four columns in each panel were connected by iron beams, the beams running north and south being known as "column beams," and those running east and west as "girders." At equi-distant intervals, running north and south, were two beams,

known as "intermediate" beams, which divided the panel into three rectangular divisions. The arrangement of the building was such that, for instance, the south girder of one panel was the north girder of the panel immediately south of it, and west column beam of one panel was the east column beam of the panel immediately west of it. On each side of each column beam, and about one foot from the beam, there were laid above the girders, from north to south, two long timbers, each separated from the other by a small space, which were called "16″x16″ timbers." These timbers were of such length that they extended from north to south over two panels, or more than one panel. But while these timbers were supported by the girders, they did not rest immediately upon them; they were "blocked up," that is, blocking about three inches in thickness being laid on the girder, the bottom of the timbers was about three inches higher than the level of the top of the girder beam and the other beams. At the four corners of each column, and resting on said 16″x16″ timbers, the gang of "house movers," or "Freistadt's men," placed the piles of cribbing, consisting of 6″x6″ timbers, about four feet long, which were used in the work of raising the roof. There were four piles of cribbing surrounding each column. In order to have a convenient staging or scaffold to walk upon while doing this work, Freistadt's men placed two 2″ planks underneath and outside of each cribbing, running east and west about parallel with the girders. These planks were laid *underneath* the 16″x16″ timbers, which, as above mentioned, ran about parallel with the column beams, and were three inches above the level of the beams. These planks were about sixteen feet long, and extended over the column beam and the two intermediate beams, so that one end of the plank rested on the column beam, and the other end rested on the intermediate beam farthest away from the column beam, and the middle of the plank rested

on the other intermediate beam. There being this *three* inch space between the bottom of the 16"x16" timbers and the level of the top of the beams, it is apparent that a *two* inch plank, placed on top of the column beam and intermediate beams, and *underneath* said timbers, would not be fastened, and would be liable to be moved out of position from one cause or another, and the evidence tends to show that "Freistadt's men" endeavored to, and generally did throughout the building, securely fasten these planks by means of wedges, when they erected these scaffolds. The evidence also shows that, when the accident occurred, deceased and his gang of workmen were engaged in raising iron in a panel adjoining State street and the third panel south of the alley on the tenth floor, and that deceased, having occasion to get some blue print plans, which were deposited in a cribbing, located in the fourth panel south of said alley and immediately southeast of the southwest column of said third panel, stepped upon one of these planks, which was underneath said cribbing and about fifteen inches south of the south girder of said third panel, and the plank gave way under his weight, and tipped, and he fell to the floor below, and sustained injuries, from the effects of which he subsequently died. The evidence also shows that the plank had been in place for eight or nine days, and had been used continuously by "Freistadt's men" while putting up said cribbing, and, after they had completed their work at that particular point, by other workmen of the several iron gangs, that there had been no previous indications that said plank was unsafe, and that said plank, just prior to, or at the time of, the accident, may have slipped at its westerly end off of the column beam, permitting the deceased to fall, and that said plank was probably not fastened by any wedges above mentioned.

The evidence further shows that shortly before the accident the deceased, and his gang, had built a scaf-

fold for their derrick to stand upon, and runways thereabouts for the men to walk and stand upon while operating the derrick, and for the additional purpose of conveying iron to said derrick, and that the derrick was located about in the center of said third panel, north and south, but near the west column beam of said panel, and was supported by said column beam, the nearest intermediate beam, and the 16"x16" timbers east of said column beam, above mentioned; and that, at the time of the accident, there was no temporary flooring of any kind on said tenth floor, except said runways about said derrick, and other similar runways in other panels, the 16"x16" timbers, and said 2" planks about the cribbings in the various panels.

The evidence further shows that one E. J. McDowell was the superintendent for the defendant corporation in the work on the building, and that he was the man in charge of the various iron gangs at work on the building, and that about two days before the accident, and after ''Freistadt's men'' had raised the roof to a height sufficient to allow the raising of the iron above the tenth floor, and while at least some of the raising gangs had commenced that work on said floor, a conversation was had, relative to the use of said 2" planks near the cribbings, between said McDowell, Frost, the deceased, one Scanlin, foreman of another raising gang, and other workmen, to which conversations three witnesses testified. Joseph Scanlin testified that at the time he went upon the tenth floor McDowell ''was superintendent there; he gave us instructions; told us to go ahead and do our work, and do it as quick as possible.''

''Q. When you went up there, did you hear McDowell say anything with reference to what should be done with the boards laying there, or planks?''

''A. He told me to go ahead and use any board I got hold of.''

Richard Edwards, a workman in the gang of which

the deceased was the foreman, testified that after he went to work on the tenth floor a conversation was had with McDowell with reference to the 2″ planks, and that Joseph Scanlin, and the deceased, Frost, were present.

"Q. Now, at that time, did you have any conversation with McDowell with reference to the planks?"

"A. Yes, sir. He told us to use these planks as they were. He says: 'Go ahead and use these planks as they lay. Go ahead and use Freistadt's planks around the cribbing.'"

The witness further testified on cross-examination:

"Q. Well, you were compelled to use them, anyhow, were you not?"

"A. We had to use them; we had to walk on them."

John Dugan, also a workman in Frost's gang, testified: "Joe Scanlin got one of the derricks, and he started to raising beams, and I heard Scanlin say—"

"Q. State what McDowell said?"

"A. You will have to use them planks. He told us that we would have to use these planks; that there were no others there, and that we would have to get around on them."

It also appeared from the testimony of at least one of the witnesses that it was the usual custom of structural iron workers to build their own scaffolds, but there was no evidence that the deceased's contract of employment was made with reference to such custom.

It also appears from the testimony of some of the witnesses that, because of certain actions and movements of Shirley's gang in said fourth panel just prior to the accident, and because of certain actions and movements of deceased's gang in the third panel just prior to the accident, possibly the particular planking in fourth panel, where the deceased fell, *may* have been moved out of place, or the wedges there loosened, if any wedges at any time were there, but there is no positive testimony of any disturbance of said planking immediately prior to the accident.

The declaration consisted of two counts. The first count charged that defendant negligently failed to provide as safe a place for the said Frost to do the work required of him as the nature of the work would permit, in that he, the said Frost, while exercising due care for his own safety, "stepped upon an improperly supported plank upon the girders and joists of said tenth floor, which gave way with him, and he was precipitated to and upon the floor beneath, sustaining mortal injuries," etc. The second count proceeded upon an alleged violation of an ordinance of the city of Chicago, a portion of which is as follows:

"It shall be the duty of all owners, contractors and builders, and all persons who shall have the supervision or control of the construction or remodeling of any building more than thirty feet high, to put in and lay upon the upper side of the joists or girders of each story in any building, as soon as the joists or girders are laid, a good and substantial temporary or permanent floor for the protection of employes and all persons engaged in or upon the construction of said building wherein no unprotected opening shall be left; and it shall be unlawful to place or put up the joists or girders of another story until each lower floor is thus laid."

The second count, after setting out said ordinance, charged that the said building, which defendant was engaged in remodeling and adding additional stories to, "was more than thirty feet high," and that defendant, not regarding its duty as required by said ordinance, negligently "failed to lay upon the upper side of the joists and girders of the tenth story, before putting up the joists or girders of the story next above, * * * a good and substantial floor," by reason whereof said Frost, while exercising due care for his own safety, fell and was mortally injured, etc.

During the trial the court admitted in evidence, over objection, that portion of said ordinance which was set out in the declaration, and, at the conclusion of

plaintiff's evidence, overruled defendant's motion to take the case from the jury, whereupon defendant rested and did not introduce any evidence, and the court again denied defendant's motion to take the case from the jury, and subsequently the jury, after the court had given fifteen instructions offered by defendant, returned a verdict in favor of the plaintiff for ten thousand dollars, and the judgment followed.

Counsel for appellant, in urging this court to reverse the judgment, makes the following points: The trial court erred, (a) in admitting said ordinance in evidence, (b) in refusing to direct a verdict for the defendant on each count of the declaration, (c) in admitting improper and incompetent evidence over objection, and (d) in refusing certain instructions offered by defendant; (e) that the verdict is excessive, and (f) that counsel for plaintiff, in his argument to the jury, made improper remarks prejudicial to defendant.

On the question of the admission in evidence of said ordinance counsel for appellant argues that it should not have been admitted because, (1) the evidence failed to disclose that defendant had the supervision or control of the construction or remodeling of said building, (2), the two new stories which were being added to said building were not over thirty feet high, and (3), the evidence failed to disclose any breach of the ordinance, in that the laying of joists and girders of "another story," to wit, the eleventh story, had not been commenced, and, therefore, it was not then necessary to have the flooring in on the tenth floor required by the ordinance.

While we think it may be properly inferred from the evidence that the defendant did have the supervision and control of the construction and remodeling of said building, still, even if this were not so, appellant is in no position to raise the point, it not having filed a special plea alleging this fact, but only the gen-

eral issue.   Morris v. Williams, 143 Ill. App. 140; Pennsylvania Co. v. Chapman, 220 Ill. 428; Chicago, etc. Co. v. Jerka, 227 Ill. 95; Brunhild v. Chicago, etc. Co., 239 Ill. 621.

As to counsel's contention that the ordinance is not applicable because the stories to be added to the building were not over thirty feet high, we think that, even if the evidence disclosed that such additions were not of that height, which we are not prepared to say is so, still the ordinance, as we construe it, is applicable to any owner, contractor or builder who is engaged in the remodeling of any *"building* more than thirty feet high,'' and the evidence shows that said building was about 150 feet in height.

As to counsel's third contention that the evidence failed to disclose any breach of the ordinance, in that the laying of the joists and girders of ''another story'' had not been commenced, suffice it to say that the witness Scanlin testified that, on the day of the accident, the girders of three panels were in place on the eleventh floor.

We are therefore of the opinion that the trial court properly admitted said ordinance in evidence.

Counsel for appellant also urges that the trial court erred in not directing a verdict for his client on the second count of the declaration—the ordinance count, for the reason that no breach of the ordinance was shown.   From what has already been said it sufficiently appears, we think, that the evidence disclosed a violation of said ordinance, and we are of the opinion that the trial court did not err.   A violation of such an ordinance is *prima facie* evidence of negligence, if such violation contributed to the injury, which we think it did.   O'Donnell v. Riter-Conley Company, 124 Ill. App. 544; H. Channon Co. v. Hahn, 189 Ill. 28; True & True Co. v. Woda, 201 Ill. 315.

Counsel for appellant states that the gist of the first count of the declaration is that deceased ''stepped upon an improperly supported plank upon the girders

and joists of said tenth floor, which gave way with him," and argues that the trial court erred in not directing a verdict on that count, because: (1) deceased assumed the risk of just such an accident as this in a building in the course of construction, (2) that before plaintiff can recover he must establish that defendant had superior means of knowledge over deceased of discovering the dangerous condition of the particular planking, which plaintiff did not do, (3) that the position of deceased as a foreman imposed upon him, rather than upon defendant, the duty of making the necessary inspections of the particular planking, and (4) that the evidence showed that the condition of the particular planking was reasonably safe in that it had been used for several days prior to the accident, and that there is no evidence tending to show any notice to defendant of changed conditions, or any want of ordinary care on the part of defendant in affording to deceased a safe place in which to work.

To which contention counsel for appellee replies, (1) that the doctrine of assumption of risk, as applied in this state to certain accidents happening in buildings in the course of construction, does not apply to the facts in this case, where the evidence tends to show that deceased was directed by defendant's superintendent to make use of the particular planking, (2) that it makes no difference in this case whether or not defendant had superior means of knowledge over deceased of discovering the dangerous condition of the planking, and that, where a master furnishes a servant with a staging upon which to work and directs that servant to use it, as in this case, the law imposes upon the master the duty of providing a secure and safe staging, although another person may have constructed it, (3) that this duty of the master towards the servant is a continuing duty, requiring the master, rather than the servant, to exercise reasonable diligence in making frequent and careful inspections, and that it

was for the jury to determine in this case, under all
the evidence, whether or not the defendant had exer-
cised such reasonable diligence in making such inspec-
tions, and (4) that under the law the servant does not
assume the risks arising from latent dangers or de-
fects, of which the master could have had knowledge
by the exercise of reasonable care, and that in this
case, under the particular arrangement of the plank-
ing, and the evidence tending to show the absence of
the wedges at the place of the accident, in connection
with all the other facts proved on the trial, it was for
the jury to say whether or not the defendant was
guilty of negligence, and whether or not at the time of
the accident the deceased was exercising due care for
his own safety.

After a careful review of the evidence in this case,
and of many pertinent decisions, we are of the opinion
that the trial court did not err in refusing to direct a
verdict for the defendant on the first count of plaint-
iff's declaration.

While there is some difference of opinion in the re-
ported cases as to whether or not the master is liable
for a servant's injuries occasioned by the fall of a
scaffold, because of some latent defect, where the mas-
ter directs the servant to make use of such scaffold,
and which scaffold the servant had no part in con-
structing, and which had been abandoned by those who
erected it, still the current of authority seems to be
that the master, having adopted the scaffold as his own,
is consequently liable, under the rule that it is the duty
of the master to furnish the servant with a reasonably
safe place in which to work.  In Bourbonnais v. West
Boylston Mfg. Co., 184 Mass. 250, actions were in-
stituted by two carpenters for injuries alleged to have
been caused by their being set to work by defendant's
superintendent upon an unsafe temporary staging.
There was evidence that one upright of the staging
was fastened insecurely, that two braces, which at

first had been used to keep it in place, had been removed before the accident, that the staging was built by a superintendent of the defendant for another job for which it had been used successfully, as the plaintiffs knew, that another superintendent of the defendant in effect told plaintiffs to use the staging in doing their work, and knew that plaintiffs were using it, that plaintiffs had no part in building the staging, that neither of said superintendents had inspected the staging at any time since its completion, and that the staging fell while plaintiffs were at work upon it and they were injured. It was *held* that whether or not defendant was negligent in furnishing the staging, and in directing or allowing plaintiffs to use the same, and whether or not plaintiffs were in the exercise of due care, were questions of fact for the jury.

In Chicago and Alton R. R. Co. v. Maroney, 170 Ill. 520, where one of a gang of bricklayers was injured by the fall of a defectively constructed scaffold which had been erected by the foreman and workmen of another gang, and where it appeared from the evidence that certain braces, intended to be used in the construction of the scaffold and necessary to be used to properly strengthen it, were not used, it was *held* that the master was liable, notwithstanding the fact that plaintiff had not affirmatively proved (a) that the master had notice of the defect, and (b) that plaintiff had not had equal opportunity with the master of knowing of said defect; and that plaintiff had a right to assume that the master had discharged his duty, and to act upon that assumption, and that, even if it be conceded that the men who constructed the scaffold were fellow servants of plaintiff, still the master was liable, and on the ground of his duty to furnish to plaintiff a reasonably safe place and appliances in which and with which to work, which duty he could not divest himself of by any delegation to others.

In McBeath v. Rawle, 93 Ill. App. 212, a scaffold,

upon which plaintiff's intestate was working at setting stone upon a building, and which had been previously constructed by the brick-mason gang, gave way and fell. The cause of the accident was an unsound scantling used as one of the supports of the scaffold. This scantling was weakened by a knot in it, which was open to observation and could have been detected by inspection. It was urged that because of these facts there could be no recovery, and upon the rule of law as enunciated in the cases of Goldie v. Werner, 151 Ill. 551, Howe v. Medaris, 183 Ill. 288, and many similar cases. But the Appellate Court held that said rule "does not apply to defeat a recovery upon facts which disclose that the defect in a scaffold was one which the master should have discovered by such inspection as the exercise of ordinary care would require, and where the servant does not appear to have had knowledge of the defect, and is so employed that he has the right to rely upon the duty of the master having been performed, without himself inspecting the scaffold." The case was affirmed in McBeath v. Rawle, 192 Ill. 626, where it was also decided that knowledge by a stone-setter of a well recognized custom, in the erection of stone veneer buildings, for the brick-masons to erect the scaffolding, upon which the stone-setters worked, does not waive the stone-setter's right to have his master provide him a reasonably safe place to work, in the absence of proof that his contract of employment was made with reference to such custom.

But we think the further analysis of the many reported cases, pertinent to the issues involved here, is unnecessary to disclose that the trial court did not err in refusing to direct a verdict for the defendant. Reference, however, is made to the following "scaffold" cases: Hinchliff v. Robinson, 118 Ill. App. 450; Lafayette Bridge Co. v. Olsen, 108 Fed. Rep. (C. C. A.) 335; Chambers v. American Tin Plate Co., 129 Fed. Rep. (C. C. A.) 561; Edward Hines Lumber Co.

v. Ligas, 172 Ill. 315; Metcalf Co. v. Nystedt, 203 Ill. 333; Ehlen v. O'Donnell, 205 Ill. 38; Shillinger Bros. Co. v. Smith, 225 Ill. 74; Dickson v. Swift Co., 238 Ill. 62.

No good purpose will be served in discussing the other points raised by counsel for appellant. Suffice it to say that we have considered each and all of them and are of the opinion that the verdict is not excessive, that the remarks of counsel for plaintiff in his argument to the jury, which are complained of, were not so prejudicial to appellant as to warrant a reversal of this case, that the trial court did not err in refusing to give the instructions mentioned, and that the admission by the trial court of certain evidence complained of was not prejudicial error.

For the reasons indicated the judgment of the Superior Court is affirmed.

*Judgment affirmed.*